# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

KNIFE RIGHTS, INC.; RUSSELL
ARNOLD; RGA AUCTION SOLUTION dba
FIREARM SOLUTIONS; JEFFREY
FOLLODER; MOD SPECIALTIES; EVAN
KAUFMANN; ADAM WARDEN:
RODNEY SHEDD

               Plaintiffs,

     v.

MERRICK B. GARLAND, Attorney General
of the United States; UNITED STATES
DEPARTMENT OF JUSTICE,

              Defendants.

Civil Action No. 4:24-cv-926

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (28 U.S.C. § 1331; 42 U.S.C. § 1983); 15 U.S.C. §§ 1241-1245)

**INTRODUCTION**

1.      In *District of Columbia v. Heller*, the Supreme Court made clear that "The 18th-century meaning" [of "Arms"] is "no different from the meaning today." 554 U.S. 570, 581 (2008). That is to say, "arms" are "'[w]eapons of offense, or armour of defense.'" (*id*., (*quoting* 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978); (cleaned-up), and further defined arms to mean "'anything that a man wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.'" *Id*. (*quoting* 1 A New and Complete Law Dictionary (1771) (cleaned-up).

2.      Knives are "arms" protected under the plain text of the Second Amendment. The "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28 (2021) (quoting *Heller*, 554 U.S. at 582). Indeed, the Supreme Court made clear in *Bruen* that the Second and Fourteenth Amendments protect the right to acquire, possess, and carry arms for self-defense and all other lawful purposes—inside *and* outside the home.

3.      Despite Supreme Court precedent, the Federal Switchblade Act, 15 U.S.C. §§ 1241-1245, enacted in 1958 as Public Law 85-623, prohibits the introduction, manufacture for introduction, transportation, or distribution into interstate commerce of "switchblade knives," as defined. 15 U.S.C. § 1241(b). The Act also prohibits the manufacture, sale, or possession of any "switchblade knife" within "Indian country," including tribal reservations, and federal land, such as federal Bureau of Land Management (BLM) public land and National Parks. 15 U.S.C. § 1243 ("Federal Knife Ban"). The criminal penalties for violating the Federal Knife Ban (15 U.S.C. §§ 1242, 1243) are broad and severe. "Whoever"

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

violates the Federal Knife Ban "shall be fined not more than $2,000 or imprisoned not more than five years, *or both*. 15 U.S.C. §§ 1242, 1243 (emphasis added). As shown below, the Federal Switchblade Act continues to be in effect, active, and enforced, including threats of enforcement.

4.    For example, in 2020, federal and state agencies raided Johan Lumsden's home/business (a switchblade manufacturer and dealer) for alleged violations of the Federal Switchblade Act. The raid on Mr. Lumsden reverberated throughout the knife industry, including rumblings with knife manufacturers and dealers, throughout the United States.

5.    As an additional example, in April 2007, Spyderco, Inc. (Spyderco), a Colorado corporation, which manufactures and sells knives, was charged with mailing and delivering, or causing to be delivered, automatic opening knives (switchblades), including butterfly knives, which are non-mailable under Title 18, United States Code (USC), Section 1716(g), in violation of Title 18 U.S.C. 1716(j)(1).  Spyderco pled guilty and was sentenced by judgment entered in *United States of America v. Spyderco, Inc.*, U.S. District Court, Northern District of California, No. CR-07-00203-001 WDB.

6.    The Court sentenced Spyderco; and the sentencing required, among other things, Spyderco to: (a) pay to the U.S. a substantial fine ($75,000) and a special assessment ($125.00); (b) forfeit all knives seized by the U.S. during the search warrant of Spyderco's premises; (c) issue, post, and mail notices of recall to customers, wholesalers, and distributors; and (d) implement measures that ensure such knives will only reach "legal markets," including requiring Spyderco to use a specified "Acknowledgment and Representations" form for its automatic knife distributors and sellers that require such companies to acknowledge and comply with the Federal Switchblade Act before reselling knives purchased from Spyderco.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

7.     Additionally, the Court's sentencing *broadly* prohibited Spyderco from engaging in, among other activities, the transport, distribution, manufacture, sale, introduction, or attempted introduction into interstate commerce knives, defined as switchblades under Title 15 U.S.C. Sections 1241-1245 (Federal Switchblade Act) or Title 18 U.S.C. 1716, in violation of the law. Specifically, the Court's Judgment provides:

> "The defendant shall not import, transport, distribute, *manufacture, sell, introduce, or attempt to introduce into interstate commerce knives*, *defined as switchblades under Title 15, United States Code Sec. 1241 – 1245* or Title 18, United States Code Sec. 1716 or the rules and regulations lawfully promulgated thereunder, in violation of the law. Such activities by defendant Spyderco, Inc. with respect to such knives will be done legally and will take place employing measures to provide reasonable assurance that such knives will only reach legal markets. Such measures shall include use of the form attached hereto as Exhibit A in connection with such activities. [Exhibit A, Acknowledgment and Representations form]."

(Judgment, filed April 12, 2007, *United States of America v. Spyderco, Inc*., No. CR-07-00203-001 WDB, U.S. District Court, Northern District of California, at 2, ¶5 [emphasis added].)

8.     Since 2007 and to the present, manufacturers and retailers throughout the United States also implement and require the so-called "Spyderco Acknowledgment and Representations" in connection with their sales of automatic opening knives (switchblades). Plaintiffs allege on information and belief that manufacturers and retailers, which are also members of Plaintiff Knife Rights, Inc. (Knife Rights), adhere to such requirements, acknowledgments, and representations out of fear that the U.S. Attorney will target them, as it did with Spyderco—a well-publicized arrest, search/seizure, and prosecution that sent shock waves throughout the knife industry in the United States. Plaintiffs further allege that such acknowledgment/representation requirements are needless, impermissible, and

violate the Second Amendment rights of Plaintiffs, including members of Plaintiff Knife Rights.

9.     As a further example, in 2009, Congress amended the Federal Switchblade Act to add an exception to the criminal prohibitions against the sale, use, transport, carry, and possession of a switchblade knife (as defined). The 2009 amendment was included in the Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 562, 123 Stat. 2142. Therefore, Congress's actions continue to affirm that the Federal Switchblade Act, as amended, is in effect, active, and enforceable.  Said differently, if the Federal Switchblade Act were moribund, Congress would not be taking action as recently as 2009 to amend it.

10.     Further, Plaintiff Knife Rights, Inc. has participated in the introduction and support of the proposed Knife Owners Protection Act, which includes the proposed repeal of the Federal Switchblade Act. Knife Rights initiated its efforts to repeal the Act, starting in the 115th Congress in 2017 through the 117th Congress in 2020, but repeal efforts have not yet succeeded. As a result, Congress continues to keep the Federal Switchblade Act in effect, active, and, therefore, subject to enforcement.

11.     Additionally, as recently as March 7, 2024, U.S. Customs and Border Protection continues to publish notice to the traveling public that traveling with a "switchblade knife" (as defined) is prohibited. Specifically, the 2024 Notice provides that, "Switchblade knives and other spring-loaded knives are prohibited and may be subject to seizure."

12.     Further, in 2024, Defendants admitted to enforcement of the Federal Switchblade Act, though claiming that such enforcement has been modest over the years. Defendants' admissions of enforcement, even if presently limited, confirm that the Federal Switchblade Act is in effect, active, and subject to enforcement.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Moreover, Defendants' enforcement, though presently limited, is no assurance that the Federal Switchblade Act will not continue to be enforced now and in the future; and Defendants have provided no assurance, nor can they, that the Federal Switchblade Act will not continue to be enforced now and in the future. Relatedly, Defendants' purported limited enforcement of the Federal Switchblade Act is not "modest" or "limited" when viewed from those subject to indictment, prosecution, and criminal and other penalties and consequences.

13.     Given: (a) the 2020 Lumsden raid, a raid well known in the knife industry, including manufacturers and dealers throughout the United States; (b) the 2007 Spyderco indictment, plea, and sentencing penalties, including the acknowledgment and representation requirements that reverberated in the knife industry throughout the United States from 2007 to the present; (b) the 2009 Congressional amendment to the Federal Switchblade Act; (c) the 2017-2020 efforts to repeal the Federal Switchblade Act, which have not yet been successful; (d) Defendants' 2024 admissions of enforcement of the Federal Switchblade Act; (e) Defendants' failure and inability in 2024, to provide any unequivocal assurances that the Federal Switchblade Act will not continue to be enforced now and in the future (despite that any such assurances would not be binding on Congress or any future administration); and (f) the 2024 federal agency notification that traveling with a "switchblade knife" (as defined) is prohibited and subject to seizure, the Federal Switchblade Act continues to be in effect, active, viable, operative, and enforceable with severe criminal and other penalties and consequences.

## FEDERAL SWITCHBLADE ACT

14.     In enacting the Federal Switchblade Act, Congress used its power to regulate commerce through the Commerce Clause of the U.S. Constitution to limit the manufacture, transport, sale, distribution, and possession of so-called

switchblade knives (as defined).

15.    First, the Federal Switchblade Act, 15 U.S.C. § 1242, prohibits the introduction, manufacture for introduction, transportation, or distribution in interstate commerce any switchblade knife (as defined), along with a fine, imprisonment, or both. Section 1242 provides:

> "Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

16.    This first section, 15 U.S.C. § 1242, prohibits the manufacturing, transportation, or distribution into interstate commerce of any switchblade knife, as defined. As shown, Section 1242 further subjects the manufacturer, transporter, or distributor to severe penalties through fines, imprisonment, or both. Section 1242 also prohibits and penalizes anyone ('whoever") that "knowingly introduces" any switchblade knife — by sale, purchase, carry, or possession—over state lines and beyond. See also 15 U.S.C. § 1241 (defining "interstate commerce" to mean "commerce between any State, Territory, possession of the United States, or District of Columbia, or any place outside thereof").

Second, the Federal Switchblade Act, 15 U.S.C. § 1243, prohibits the manufacture, sale, or possession of any switchblade knife within specified jurisdictions, and imposes the *same* harsh criminal penalties — a fine, imprisonment, or both. As shown in Section 1243, its prohibitions apply to, and prohibit, the manufacture, sale, or possession of any "switchblade knife" within "Indian country," including Tribal reservations, and federal land, such as federal BLM public land and National Parks—both of which are used by designated Plaintiffs and the public for boating, rafting, camping, day use, hiking, mountain biking, climbing, hunting, fishing, shooting, off-highway vehicle (OHV) uses, and other public recreation. (See

U.S. Department of the Interior, BLM, maps throughout the United States at https://www.blm.gov/maps, last accessed June 22, 2024). Section 1243 provides:

> "Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

17.     This second section, 15 U.S.C. § 1243, prohibits the manufacture, sale, or possession of any switchblade knife, as defined, within Native American (Indian) land and reservations, U.S. territories (*e.g.*, Puerto Rico, Guam), federal public land (e.g., National Parks, BLM public land) and defined maritime and territorial jurisdictions of the U.S. (*e.g.*, Navy vessels, government-owned aircraft). Sections 1242 and 1243, collectively, constitute the "Federal Knife Ban," as referenced in this case.

18.     Further, the Federal Switchblade Act, 15 U.S.C. § 1244, contains extremely narrow exceptions where the prohibitions in sections 1242 and 1243 do not apply. The exceptions are quintessential examples of narrow, arbitrary, and largely inapplicable exceptions that do not apply to the lion's share of law-abiding citizens throughout the United States.

19.     Defendants' enforcement of the Federal Knife Ban unconstitutionally infringes on the fundamental rights individuals who reside in Texas and other States within the U.S. to keep and bear common, constitutionally protected arms— including automatic opening knives (or switchblade knives). The Federal Knife Ban prohibits the right to manufacture for sale, sell, transport, distribute, purchase, transfer, possess, and carry any switchblade knife (as defined) between any of the 50 states, Washington D.C., and any U.S. territory (*i.e.*, interstate commerce), despite that automatically opening knives, or switchblades, are in common use and protected

by the Second Amendment (see Section 1242).

20.     The Federal Knife Ban also prohibits the manufacture, sale, or possession of any "switchblade knife" within Indian country, including Tribal lands and reservations, and federal lands, including federal BLM public land and National Parks—all of which are used by designated Plaintiffs and the public for recreation. See Section 1243 and 18 U.S.C. §7 (broadly defining "Federal land") and 18 U.S.C. § 1151 (broadly defining "Indian country").

21.     This Complaint challenges the constitutionality under the Second Amendment of the Federal Switchblade Act, Sections 1241, 1242, 1243, and 1244. Plaintiffs do not challenge in this case Section 1245 (ballistic knives) or the Act's importation provision.

22.     Because the Second Amendment "is exercised individually and belongs to all Americans (*Heller*, 554 U.S. at 581), and because it "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense" (*Bruen*, 142 S. Ct. at 2118), Defendants' enforcement of the Federal Knife Ban must be declared unconstitutional and enjoined.

## PARTIES AND THEIR STANDING

### Knife Rights/Institutional Plaintiff

23.     Plaintiff Knife Rights is a section 501(c)(4) member advocacy organization incorporated under the laws of Arizona with a primary place of business in Gilbert, Arizona. Plaintiff Knife Rights serves its members, supporters, and the public through efforts to defend and advance the right to keep and bear bladed arms. Plaintiff Knife Rights has members and supporters in Texas and states throughout the Country. The interests that Knife Rights seeks to protect in this lawsuit are germane to the organization's purposes. Plaintiff Knife Rights sues on behalf of its

members, including the Individual Plaintiffs herein, as part of Plaintiff Knife Rights' extraordinary efforts to protect its members from the Federal Knife Ban's operation, enforcement, and imposition of its several criminal penalties and the loss or non-revocation of their federal firearms licenses. Plaintiff Knife Rights is hereinafter referred to as the "Institutional Plaintiff" and/or "Knife Rights." Plaintiff Knife Rights' members include peaceable, law-abiding individuals in Texas that want to exercise their right to bear arms, now and in the future, through the acquisition, possession, and carriage of automatically opening knives prohibited under the Federal Knife Ban and Defendants' enforcement of the Federal Switchblade Act. Plaintiff Knife Rights' members also include manufacturers and retailers of automatically opening knives, which face the same prohibitions under the Federal Knife Ban, along with Defendants' enforcement of the Act. Furthermore, as alleged above, Spyderco's government-mandated acknowledgment/representation form is itself needless, impermissible, and violative of the Second Amendment.

24.   Organized in 2006, Plaintiff Knife Rights' mission is to, among other things, ensure that federal and state restrictions placed on knives are not only repealed, but stopped from ever being enacted. Knives are one of mankind's oldest and most commonly used tools, and their ownership and lawful possession, use, and carry are fully protected by the Second Amendment. Plaintiff Knife Rights seeks to ensure that the right to keep and bear these bladed arms is well protected through legislative efforts, defense of owners' civil rights through litigation and advocacy, and public education. Plaintiff Knife Rights serves its members, supporters, and the public through these efforts to defend and advance the right to keep and bear bladed arms.

25.   Additionally, starting in the 115th Congress in 2017 through the 117th Congress in 2020, Knife Rights has participated in the introduction and support of

the proposed Knife Owners Protection Act, which, among other things, proposed the repeal of the Federal Switchblade Act. However, to date, all such repeal efforts have failed to be successful—which, in part, is due to Congressional action to reject repeal of the Federal Switchblade Act; thereby continuing to keep the Act viable, operative, and enforceable.

26.    In Texas, however, Knife Rights successfully worked to repeal the ban on switchblades in 2013. In 2015, Knife Rights successfully worked to get knife law preemption enacted, which extended that switchblade ban repeal throughout the state and ensured any future ban repeals would apply statewide. In 2017, Knife Rights successfully worked to get Texas' ban repealed on "illegal knives"— which included a ban on Bowie knives, daggers, dirks, stilettos, poniards, swords, spears, and blades over 5.5 inches. In 2019, Knife Rights successfully worked to get Texas' ban repealed on the carry of clubs (including tomahawks) and the possession and carry of knuckles (including trench knives and the like).

27.    As to bans on automatically opening knives (or "switchblade knives"), Knife Rights has worked to get switchblade bans repealed in 18 states. A detailed list of Knife Rights' legislative accomplishments is on the Knife Rights website at: https://kniferights.org/about/accomplishments, which is incorporated by reference herein.

28.    As part of its educational efforts, Knife Rights Foundation, Inc., a section 501(c)(3) organization,  which is affiliated with Plaintiff Knife Rights, Inc., has published a downloadable app, "LegalBlade," which summarizes each states' knife laws by "Knife Type" and provides the user with information on whether specific knives are legal for "Possession," "Open Carry," and "Concealed Carry" in each state. LegalBlade also provides direct links to each state's relevant knife/weapon statutes. Plaintiff Knife Rights supports and promotes the LegalBlade

App.

29.    Plaintiff Knife Rights is taking part in this legal action to further pursue its stated goals and purposes — and they are to expend substantial time, effort, money, and other resources directed at ensuring the Second Amendment right to bladed arms is fully protected throughout the United States. Plaintiff Knife Rights' goals, purposes, and political, educational, and legislative accomplishments, however, are separate and distinct from its litigation efforts. Plaintiff Knife Rights, through its officers, volunteers and members, primarily advance the organization's political, educational, and legislative accomplishments. In contrast, Plaintiff Knife Rights' litigation endeavors require close work and coordination with special counsel, and that time, effort, and cost are over and above Knife Rights' customary activities and accomplishments. In short, while Plaintiff Knife Rights' political, educational, and legislative efforts are part and parcel of its customary actions and accomplishments, Knife Rights' litigation time, efforts, and costs incurred are extraordinary and distinct. (As alleged further below, Plaintiff Knife Rights' extraordinary expenditures of time, effort, and cost on litigation matters to protect knife rights have placed a real, concrete drain on Knife Rights' resources, particularly the funds relied upon from our member contributions to also pursue our other customary political, educational, and legislative efforts.)

30.    The actions undertaken by Plaintiff Knife Rights, which are described in detail above, show that Knife Rights has expended a substantial amount of time, effort, money, and other resources in its opposition to the Federal Switchblade Act for several years. Our substantial endeavors have placed a real, concrete, and distinct drain on our time, effort, money, and other resources, particularly funds from our member contributions. This distinct drain also impairs our ability to continue to implement our mission as an advocacy organization for the knife community with

respect to our customary political, educational, and legislative actions and accomplishments.

31.    The Federal Switchblade Act, and its continued unconstitutional enforcement, also forces Knife Rights to drain its time, effort, money, and other resources to educate its members about the Federal Switchblade Act's unconstitutional prohibitions; and such resources would otherwise be used on other Knife Rights' goals, purposes, and endeavors. By expending substantial and extraordinary organizational time, effort, money, and other resources to challenge the Federal Switchblade Act in court, Plaintiff Knife Rights has sustained injury, harm, and losses that are over, above, and beyond its customary actions and accomplishments. Such expenditures are exceptional and not merely in furtherance of Knife Rights' mission, goals, and purposes.

32.    Such injury, harm, and losses would also be avoided if Defendants would simply take steps to voluntarily repeal or set aside the Federal Switchblade Act; or declare unequivocally that Defendants' will not enforce the Federal Switchblade Act—now and in the future. These steps, however, require Congressional action or repeal of the Federal Switchblade Act, or court intervention (as with this case), to ensure that such steps, if taken, are permanent. Instead, Defendants boldly proclaim that the federal government shows four *prosecutions* under the Federal Switchblade Act, but that the Act has not been enforced since 2010 (which, in fact, is not true). Nowhere do Defendants disavow enforcement. Specifically, nowhere do Defendants disclose that they no longer enforce the Federal Switchblade Act or that they will not enforce the law in the future. Further, Defendants' statement about low prosecutions since 2010 is not evidence that there have been no arrests, raids, charges, or pleas under the challenged provisions of the Federal Switchblade Act. The Federal Switchblade Act remains "on the books" and

can be enforced now and in the future, by this administration or a future one.

33.    Defendants could publish an official stance from the Attorney General or the Department of Justice that the challenged sections of the Federal Switchblade Act will not be enforced now and in the future. But Defendants have provided no such evidence or written assurances. Defendants could also affirm that the Federal Switchblade Act will not be used to halt: (a) the interstate commerce of switchblade knives, or (b) their possession and carry within and through Native American (Indian) land and federal public land. But Defendants have provided no such affirmation. Notably, even if Defendants did take such a stance, Plaintiffs allege on information and belief that Congress and/or future administrations could rescind the stance and actively enforce the Federal Switchblade Act.

34.    As a direct result, Plaintiff Knife Rights, and its members, face a lose-lose setting where they are injured either way—they must either continue to refrain from exercising their Second Amendment rights, or risk enforcement up to and including prosecution and severe criminal and other penalties and consequences. Plaintiffs cannot simply assume that because Defendants say that prosecutions may be down for the time being, it follows that Plaintiff Knife Rights and its members can acquire and possess switchblades and move them through interstate commerce and within and through Native American (Indian) land, National Parks, BLM public land, and other federal land—free of enforcement and criminal penalties. In short, Defendants' purported slowdown in prosecutions is not synonymous with Defendants' disavowing prosecutions and more broadly, halting all enforcement now and in the future of the Federal Switchblade Act. Quite simply, the only thing that would support any claim of a lack of a threat of prosecution is an act of Congress. As Congress has continued to enforce and amend the FSA, there is a very real threat of prosecution.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

35.     But for the Federal Switchblade Act challenged in this action, Plaintiff Knife Rights' organizational efforts would otherwise be expended in other ways. Plaintiff Knife Rights' injury, harm, and losses as an organization could also be fully redressed if the Court were to issue the nationwide injunction that Plaintiffs have requested in this case. Until then, however, Plaintiff Knife Rights and its members cannot engage in interstate commerce with respect to switchblade knives (as defined), nor purchase, possess, and carry them within and through Native American (Indian) land, National Parks, BLM public land, and other federal land without substantial risk of criminal prosecution now and in the future under the Federal Switchblade Act.

## PLAINTIFFS AND THEIR STANDING

**Plaintiffs Arnold and RGA Auction Services, dba Firearm Solutions**

36.     Plaintiff Russell Gordon Arnold is an adult natural person, a citizen of the United States, and a resident of Mansfield, Texas. Plaintiff Arnold is a peaceable, non-violent individual who is eligible to keep and bear arms under state and federal law. Plaintiff Arnold is also the owner and operator of Plaintiff RGA Auction Services LLC, doing business as Firearm Solutions (Firearm Solutions).

37.     Firearm Solutions is a federally licensed firearms dealer located in Mansfield, Texas. In the regular course of business, Firearm Solutions, buys, sells, transfers, and distributes firearms, firearm accessories, and various knives to its customers. Additionally, Firearm Solutions owns and operates an online storefront and a bricks-and-mortar business. The online storefront is found at https://www.nsg-firearms.com.

38.     Presently, Plaintiffs Arnold and Firearm Solutions do not advertise or market the sale of automatic opening knives because of the Federal Switchblade Act's prohibitions and criminal penalties, including fines, imprisonment, or both.

39.    Plaintiffs Arnold and Firearm Solutions already have an established clientele and retail business. As such, the only step required for Plaintiffs Arnold and Firearm Solutions to begin selling automatically opening knives is to immediately acquire them from manufacturers and distributors. However, Plaintiffs Arnold and Firearm Solutions cannot make any such purchases or acquisitions due to the Federal Switchblade Act.

40.    Said differently, Plaintiffs Arnold and Firearm Solutions are ready, willing, and able to immediately purchase and sell automatically opening knives and the only thing stopping them, now and in the future, is their fear of prosecution for violating Sections 1242 and 1243 of the Federal Switchblade Act. Further, selling automatically opening knives is not some far off, undefinable goal. Instead, but for the Federal Switchblade Act's prohibitions, Plaintiffs Arnold and Firearm Solutions would place orders with manufacturers and distributors to immediately purchase automatic opening knives and begin to immediately sell them. Plaintiffs Arnold would also immediately purchase such knives for his own personal use, including self-defense.

41.    Plaintiffs Arnold and Firearm Solutions have an immediate intent to acquire, possess, carry, offer for sale, sell, and distribute automatically opening knives (switchblades) through interstate commerce for lawful purposes, including self-defense. Plaintiffs Arnold and Firearm Solutions would immediately acquire, possess, carry, offer for sale, sell, and distribute automatically opening knives through interstate commerce, but for: (a) the Federal Switchblade Act, (b) Defendants' enforcement, and threat of enforcement, of the Act, and (c) the reasonable fear of arrest, search warrants, prosecution, and criminal penalties for violating the Act, including the loss or non-renewal of its federal firearms license (FFL) issued by the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives

(ATF).

42.    At present, due to the prohibitions stated in the challenged sections of the Federal Switchblade Act, neither Plaintiffs Arnold nor Firearm Solutions is willing to take the risk of knowingly and willfully violating federal law by acquiring, possessing, carrying, offering to sell, selling, transferring, and/or distributing automatically opening knives through interstate commerce. Such risk could result in arrest, search and seizure, criminal prosecution, and fines and imprisonment, or both. Such risks could also result in Firearm Solutions' revocation or non-renewal of its FFL, among, other penalties, which would directly result in the loss of Mr. Arnold's business.

43.    At present, Plaintiffs Arnold and Firearm Solutions are unable to purchase automatically opening knives through manufacturers and distributors, and to sell such knives to their customers in Texas and throughout the United States. Plaintiffs Arnold and Firearm Solutions intend to acquire and distribute such knives *without* adhering to or complying with the commonly adopted practice in the knife industry that regulates interstate commerce of automatic knives via the explicit exceptions to the FSA. Due to the Federal Switchblade Act prohibitions on interstate commerce of automatically opening knives, even if Plaintiffs Arnold and Firearm Solutions were to somehow legally acquire automatically opening knives within Texas, they are still prohibited by law from selling them to any out-of-state customer. This causes injury and harm to Plaintiffs Arnold and Firearm Solutions. Such injury and harm cannot be redressed solely because of the Federal Switchblade Act prohibitions and Plaintiffs Arnold's and Firearm Solutions' fear of prosecution under the Act. Their only known redress or remedy from the harm and losses sustained are to seek a nationwide permanent injunction against enforcement of the challenged provisions in the Federal Switchblade Act, which is part of the relief requested in

this case.

44.     But for the challenged prohibitions in the Federal Switchblade Act, Plaintiff Arnold would also acquire and possess automatically opening knives and use them on a daily basis for his own lawful purposes, including self-defense. Additionally, the Federal Switchblade Act's prohibitions on possession and carry under Section 1243 prevent Plaintiff Arnold from possessing and carrying automatically opening knives (switchblade knives) any time that he is traveling within or through any Native American (Indian) country, Tribal reservations, and on any federal land. Plaintiff Arnold has traveled within, and will continue to travel through, various states throughout the United States, including traversing through Native American (Indian) country, Tribal reservations, and federal lands such as National Parks and BLM public land. However, Plaintiff Arnold is unable to possess and carry such knives within and through these geographic areas without violating the challenged provisions of the Federal Switchblade Act, risking prosecution, and being subject to severe criminal penalties.

45.     Plaintiffs Arnold and Firearm Solutions are members of Plaintiff Knife Rights. Plaintiff Arnold and Firearm Solutions are taking part in this litigation to protect their Second Amendment rights, as well as the Second Amendment rights of similar individuals, retailers, customers, and would-be customers who have an immediate and concrete desire to lawfully purchase, distribute, sell, possess, and carry automatically opening knives through interstate commerce, but are prohibited from doing so due to the Federal Switchblade Act, Defendants' enforcement of the Act, and the imminent fear of enforcement and associated prosecution and criminal and other penalties.

**Plaintiffs Folloder and MOD Specialties**

46.     Plaintiff Jeffery E. Folloder is an adult natural person, a citizen of the

United States, and a resident of Katy, Texas. Plaintiff Folloder is a peaceable, non-violent individual who is eligible to keep and bear arms under state and federal law. Plaintiff Folloder is also the owner and operator of MOD Specialties, doing business as "MOD Specialties." Plaintiff Folloder intends, now and in the future, to acquire, possess, carry, and offer for sale, and distribute through interstate commerce, automatically opening knives for lawful purposes, including self-defense. Mr. Folloder would immediately acquire, possess, carry, offer for sale, acquire and distribute through interstate commerce such a knife but for the government's enforcement of the Federal Switchblade Act and his reasonable fear of arrest and prosecution for violation of the Act. Plaintiff Folloder is currently a member of Plaintiff Knife Rights.

47.     MOD Specialties is a federally licensed firearms dealer located in Katy, Texas. In the regular course of business, MOD Specialties buys, sells, and transfers firearms and firearms accessories and various knives in accordance with federal and state law.

48.     Presently, Plaintiffs Folloder and MOD Specialties do not advertise or market the sale of automatic opening knives because of the Federal Switchblade Act's prohibitions and criminal penalties, including fines, imprisonment, or both.

49.     Plaintiffs Folloder and MOD Specialties have an established clientele and retail business. As such, the only step required for Plaintiffs Folloder and MOD Specialties to begin selling automatic opening knives is to immediately *acquire* them from manufacturers and distributors. However, Plaintiffs Folloder and MOD Specialties *cannot* make any such purchases or acquisitions due to the Federal Switchblade Act. Said differently, Mr. Folloder and MOD Specialties are ready, willing, and able to immediately purchase and sell automatic opening knives and the only thing stopping them, now and in the future, is their fear of prosecution for

violating Sections 1242 and 1243 of the Federal Switchblade Act. Further, selling automatic opening knives is not some far off, undefinable goal. Instead, but for the Federal Switchblade Act's prohibitions, Plaintiffs Follder and MOD Specialties would place orders with manufacturers and distributors to immediately purchase automatic opening knives and begin to immediately sell them. Plaintiff Follder would also immediately purchase such knives for his own personal use, including self-defense.

50.    Moreover, Plaintiff Follder's and Plaintiff MOD Specialties' actual and prospective customers cannot lawfully purchase any automatic opening knives through interstate commerce; and therefore, cannot possess, carry, and use such knives across interstate lines and on federal land and within Native American (Indian) country, including Tribal reservations. This constitutes a cognizable injury to him, MOD Specialties, and their actual and prospective customers because the Federal Switchblade Act's interstate commerce prohibition is absolute; it prohibits dealers/retailers (and customers) from acquiring such knives through interstate commerce and from selling such knives to their customers.

51.    Commerce in such knives is also a prerequisite to keeping and possessing bladed arms for self-defense and other lawful purposes. Plaintiff Follder's right to pursue the Second Amendment claim in this case is for his own interests and his business interests. Further, Plaintiff Follder's business interests are derived from his actual and prospective customers, all of whom have a corollary right to keep and bear bladed arms for self-defense and other lawful purposes; and the core Second Amendment right to keep and bear arms is meaningless without the ability for customers of Mr. Follder and MOD Specialties to acquire automatic opening knives through interstate commerce, and to possess, carry, and use such knives throughout the United States, including within and through Native American (Indian) land, including Tribal reservations, and federal land.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

52.     As a direct result, both Plaintiff Folloder and Plaintiff MOD Specialties are injured by the collective inability to purchase and sell automatic opening knives to actual and prospective customers due solely to the prohibitions found in the Federal Switchblade Act. Their injury would be redressed by a favorable ruling from this Court, namely, issuing a permanent injunction against enforcement of Sections 1242 and 1243 of the Federal Switchblade Act. Their injury and the redress applies with equal force to the other named Plaintiffs in this case.

53.     Said differently, Sections 1242 and 1243 of the Federal Switchblade Act stand as an absolute barrier to Mr. Folloder's and MOD Specialties' ability to purchase and sell automatic opening knives through interstate commerce to actual and prospective customers throughout the United States. If this case secures the nationwide injunctive relief it seeks, that barrier will be removed. Once removed, at Plaintiff Folloder's direction, MOD Specialties will immediately purchase, advertise, market, and sell automatic opening knives to its customers in Texas and throughout the United States. Until then, however, Mr. Folloder's and MOD Specialties' business sales and profit-generating capability are lower than they otherwise would be if they were able to purchase and then advertise, market, and sell another new line of knives (automatic opening knives) to existing and prospective customers.

54.     Additionally, Plaintiffs Folloder and MOD Specialties frequently attend various gun shows throughout the country. Specifically, Mr. Folloder and MOD Specialties attend shows and events where they sell their products in Kentucky, Nevada, Arizona, Oklahoma, Texas, Florida, and Virginia, and they regularly travel annually to and through roughly 20 states, including traversing within and through Native American (Indian) country, including Tribal reservations, and federal land. They also attend many shows and events like the NRA's convention that is held in a

different state every year. The majority of their business, approximately 75 percent, is conducted with out-of-state clients at these shows.

55.    Because MOD Specialties maintains a FFL, Plaintiff Folloder exclusively travels by truck to attend these shows and events to conduct retail sales that are completed in accordance with federal regulations. As such, he routinely travels within and through Native American (Indian) country, including Tribal reservations, and federal land with the products that he sells.

56.    Thus, even if Plaintiff Folloder were to legally acquire automatic opening knives within the state of Texas, he would be prohibited from crossing state lines with his new automatically opening knife inventory because he would be in violation of the Federal Switchblade Act by introducing them into interstate commerce and by merely traveling within and through various states to the various gun shows/conventions where he sells his products.

57.    Moreover, if Plaintiff Folloder were to legally acquire an inventory of automatic opening knives, by travelling from state-to-state, often driving within and through federal land or Native American (Indian) country, both Plaintiff Folloder and MOD Specialties would be in violation of the FSA by *merely possessing* the knives within these prohibited areas. Attached hereto as **Exhibit A** is a true and correct copy of a map depicting the areas within the United States that are controlled, maintained, or owned by the federal government. This map shows that Plaintiff Folloder would be prohibited from merely possessing an automatic opening knife in a vast majority of the western portion of the United States.

58.    Not only does the Federal Switchblade Act prohibit Plaintiff Folloder from acquiring automatic opening knives and possessing them as a part of his business, MOD specialties, these same prohibitions apply to Mr. Folloder personally. But for the Federal Switchblade Act, both Mr. Folloder and MOD Specialties would acquire and possess automatic opening knives and use them on a

daily basis for lawful purposes but for Sections 1242 and 1243 of the Federal Switchblade Act.

59.     Plaintiff Folloder plans on visiting various National Parks, including Yosemite and the Grand Canyon. He also plans to participate in the March 2025, Bataan Memorial Death March marathon held at the White Sands Missile Range. While in attendance, Plaintiff Folloder would possess a switchblade knife for various lawful purposes but for the FSA prohibition on possession of such a knife on federal land, including the missile range.

60.     Plaintiffs Folloder and MOD Specialties are members of Plaintiff Knife Rights.  Plaintiffs Folloder and MOD Specialties are taking part in this litigation to protect their Second Amendment rights, as well as the Second Amendment rights of similar individuals, retailers, customers, and would-be customers who have an immediate and concrete desire to lawfully purchase, possess, and carry automatically opening knives through interstate commerce, but are prohibited from doing so due to the Federal Switchblade Act, Defendants' enforcement of the Act, and the imminent fear of enforcement and associated prosecution and criminal and other penalties.

**Plaintiff Evan Kaufmann**

61.     Plaintiff Evan Kaufmann resides in Austin, Texas, and has been a Texas resident for approximately seven years. Plaintiff Kaufmann is a filmmaker, creative director, visual artist, and photographer. As a part of his business, Detail Films, Plaintiff Kaufmann travels to, within, and through many states across the country. He also routinely travels to, within, and through federal lands, such as BLM public land, for filming, photography, and recreation.

62.     Plaintiff Kaufmann is currently a member of Plaintiff Knife Rights.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

63.     To date, Plaintiff Kaufmann has conducted his business in, and has vacationed and engaged in recreational activities to, within, and through, several states, including and not limited to, Oklahoma, New Mexico, Nevada, New York, and California. Plaintiff Kaufmann regularly travels with his family both within Texas and outside Texas to camp and hike. Recently, he returned from Utah with his family where they traveled throughout Utah and hiked on federal public land.

64.     Currently, Plaintiff Kaufmann does not own an automatically opening knife (switchblade knife), but wants one because he believes they are incredibly useful knives that he can use while filming in remote areas both inside and outside of Texas for utility purposes and self-defense. When filming in remote locations, there is generally very little cell service; and he believes that it would be beneficial to be able to carry an easy to open, one-hand-opening knife that he could have in his pocket at all times for his safety and general use. He would also possess, use, and carry an automatically opening knife in his everyday life for these same reasons.

65.     On December 12, 2023, Plaintiff Kaufmann went online to purchase an automatically opening knife. Specifically, he went on Knifecenter.com and selected the "Microtech 123-10Z Signature Series Zombie Tech Auto OTF Knife 3.46" Stonewashed Tanto Plain Blade, Zombie Green" automatically opening knife.

66.     After Plaintiff Kaufmann clicked on "Add to Cart" to purchase the automatically opening knife, he read a notification (pop-up) on Knife Center's website explaining that the knife could not be shipped unless the purchase fell under one of the exceptions to the Federal Switchblade Act.

67.     Plaintiff Kaufmann reviewed the exceptions listed on Knife Center's website and concluded that he did not fall within any exception that would allow him to legally purchase the knife that he had selected. Understanding that it was illegal to complete the purchase, he cancelled his transaction due to the Federal Switchblade

Act prohibiting him from purchasing and possessing an automatically opening knife. Plaintiff Kaufmann considers the law a switchblade ban (Sections 1242, 1243) with severe criminal consequences if violated.

68. At cancellation, Plaintiff Kaufmann was denied the ability to purchase the automatically opening knife that he had wanted to purchase through the internet solely because of the Federal Switchblade Act. As direct result, Plaintiff Kaufmann believes that his Second Amendment right to keep and bear arms has been unconstitutionally infringed upon. If it were not for the Federal Switchblade Act's prohibitions and penalties (Sections 1242, 1243, 1244), he would have completed his purchase and acquired the automatically opening knife. More specifically, Plaintiff Kaufmann did not complete the purchase of the knife for fear of being: (a) in violation of the Federal Switchblade Act, and (b) subject to prosecution and criminal penalties. Plaintiff Kaufmann is married with kids, has no criminal record, and risks losing his job and family if charged and convicted under the Federal Switchblade Act.

69. After the above attempted purchase, Plaintiff Kaufmann reviewed the language of the Federal Switchblade Act. As he understood it, the Act prohibits the acquisition of such knives through interstate commerce and bars the mere possession of such knives within both Indian country and federal land. While Plaintiff Kaufmann lives in Texas, he routinely travels to and through surrounding states for business and personal/recreation purposes. As a result, if Plaintiff Kaufmann were able to acquire an automatically opening knife within Texas (as they are legal in Texas), he would be prohibited from possessing the knife in many of the states in which he visits and travels through because sizable portions of those states, like Nevada, Arizona, Utah, Oklahoma, are comprised of land owned or operated by the federal BLM and other federal agencies (National Parks Service); or are Native American (Indian) land.

70.     Plaintiff Kaufmann's Second Amendment rights provide him with a legally protected interest to: (a) use interstate commerce to purchase an automatically opening knife in his resident state of Texas, and (b) possess and carry such knife as he travels within and through federal public land and Native American (Indian) land in his home state of Texas and in surrounding states. But for the switchblade ban under the Federal Switchblade Act (Sections 1242, 1243) and the related criminal fines and imprisonment, or both, Plaintiff Kaufmann would have purchased, possessed, used, and carried such knife for business, personal, recreation, and self-defense purposes throughout his home state of Texas, in surrounding states, and within and through federal public land and Native American (Indian) land.

71.     Further, if the switchblade ban under the Federal Switchblade Act were lifted or permanently enjoined, Plaintiff Kaufmann will purchase, possess, use, and carry one or more automatically opening knives for the purposes stated above, including self-defense. He will do so now and in the future but for the Federal Switchblade Act and the risk of prosecution and imposition of severe criminal penalties.

72.     The injury/harm that Plaintiff Kaufmann has sustained (*i.e.*, preclusion of his ability to purchase, possess, and carry an automatically opening knife for any lawful purpose) is directly traced to the switchblade ban under the Federal Switchblade Act and Defendant officials who are responsible for its enforcement. His injury/harm to his Second Amendment rights can and should be redressed by the Court's grant of a permanent injunction against enforcement of Sections 1242 and 1243 of the Federal Switchblade Act.

**Plaintiff Adam Warden**

73.     Plaintiff Adam Warden resides in Holladay, Utah. He has been a resident of the State of Utah for approximately 30 years.

74.    Plaintiff Warden is an avid hunter and outdoorsman, spending many of his weekends hunting waterfowl during the hunting season. He also has been a fly-fishing guide, and an avid fisherman for 40 years and goes fishing regularly. The majority of his time hunting and fishing is done within the State of Utah, but he has hunted and fished in other states, including Alaska, Montana, California, North and South Dakota, Texas, Colorado, Washington, Idaho, and Wyoming.

75.    Plaintiff Warden is a strong advocate of the Second Amendment and a current member of Plaintiff Knife Rights. Mr. Warden understands that Knife Rights is taking part in this federal lawsuit to challenge the constitutionality of the Federal Switchblade Act under the Second Amendment.

76.    Currently, Plaintiff Warden does not own an automatic opening knife, but wants to have one as they are incredibly useful knives that he can use while hunting, fishing, and in everyday life.

77.    On December 6, 2023, Plaintiff Warden went online to purchase an automatic opening knife. Specifically, he went on Knifecenter.com and selected the Pro-Tech "Rockeye Auto." After adding the automatic opening knife to his cart, he proceeded to check out. Before he was able to complete the knife purchase, a notification appeared on Knife Center's website explaining that the knife could not be shipped unless the purchase fell under one of the exceptions under the Federal Switchblade Act. After reviewing the notice, Mr. Warden also reviewed the exceptions listed on Knife Center's website and determined that he did not fall within any exception that would allow him to legally purchase the knife. Understanding that it was illegal to complete the purchase, he then cancelled his transaction.

78.    Plaintiff Warden was denied the ability to purchase an automatic opening knife through the internet because of the Federal Switchblade Act; and as

direct result, believes that his Second Amendment right to keep and bear arms has been unconstitutionally infringed upon. If it were not for the Federal Switchblade Act's prohibitions and penalties, he would have legally completed his purchase of the knife. More specifically, he did not complete the purchase of the knife for fear of being in violation of the Federal Switchblade Act and subject to criminal prosecution and severe criminal penalties.

79.    After cancelling the purchase, Plaintiff Warden noted that the Federal Switchblade Act prohibits the mere possession of automatic knives within and through Indian country and federal land. Mr. Warden lives in Utah and routinely travels within Utah and the surrounding states for personal, recreation, and business purposes. As a result, if he were able to acquire an automatic opening knife within Utah (as they are legal in Utah), he would still be prohibited from possessing the knife in a large portion of his own state because sizable portions of Utah and the surrounding states are comprised of land owned and/or operated by the federal Bureau of Land Management (BLM) and other federal agencies (e.g., National Park Service).

80.    Plaintiff Warden currently hunts, goes fishing, camps, hikes, and recreates in Utah, but he also engages in such activities in both Utah and neighboring states on and through BLM public land and National Parks. If Mr. Warden were able to purchase and possess an automatically opening knife, in the immediate future, like the one he sought to purchase, he could not possess/carry that knife in Utah and other states on and through BLM public land and National Parks without violating the Federal Switchblade Act and exposing himself to prosecution and severe criminal penalties. But for the Federal Switchblade Act and his exposure to prosecution and criminal penalties, Mr. Warden would purchase, use, possess, and carry the automatically opening knife, now and in the future, within and through BLM public land and National Parks in Utah and neighboring

states.

81.     Plaintiff Warden's Second Amendment rights provide him with a legally protected interest to: (a) use interstate commerce to purchase an automatically opening knife in his resident state of Utah, and (b) to possess and carry such knife as he travels through federal public land and Native American (Indian) reservation land in his home state of Utah and in surrounding states. But for the switchblade ban under the Federal Switchblade Act (Sections 1242, 1243) and the related criminal fines and possible imprisonment, or both, Mr. Warden would have purchased, possessed, used, and carried such knife for hunting, fishing, personal use, and protection throughout his home state of Utah, in surrounding states, and within and through Native American (Indian) land and federal land.

82.     If the switchblade ban under the Federal Switchblade Act were lifted or permanently enjoined, Mr. Warden will purchase, possess, use, and carry an automatic opening knife for hunting, fishing, and an array of other lawful uses, including self-defense. He will do so now and in the future but for the Federal Switchblade Act, and the risk of prosecution and the imposition of severe criminal penalties.

83.     The injury/harm that Plaintiff Warden has sustained (*i.e.*, preclusion of his ability to purchase, possess, and carry an automatic opening knife for any lawful purpose) is directly traced to the switchblade ban under the Federal Switchblade Act and Defendant officials who are responsible for its enforcement. His injury/harm to his Second Amendment rights can and should be redressed by the Court's grant of a permanent injunction against enforcement of Sections 1242 and 1243 of the Federal Switchblade Act.

**Plaintiff Rodney Shedd**

84.     Plaintiff Rodney Shedd is a former resident of Arizona, who recently

moved to his new residence in Tulsa, Oklahoma on September 14, 2024.

85.    Plaintiff Shedd is 57 years old and a member of the Muscogee Nation Tribe. His new residence, in Tulsa, Oklahoma, is on Muscogee Nation tribal land.

86.    Plaintiff Shedd is a strong advocate of the Second Amendment and a current member of Plaintiff Knife Rights. Plaintiff Shedd takes part in this complaint as an individual and as a member of Plaintiff Knife Rights.

87.    Before moving to his residence in Tulsa, Oklahoma, Plaintiff Shedd legal owned and possessed a automatically opening folding knife in Arizona. However, due to the Federal Switchblade Act's prohibition on the possession of automatically opening knives within "Indian country," which states,

> "[w]hoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." 15 U.S.C. § 1243

Plaintiff Shedd was forced to abandon his property in Arizona or be criminally liable for unlawfully bringing and possessing a "switchblade" knife within the Muscogee Nation tribal land.

88.    Plaintiff Shedd was forced to abandon his legally owned, common arm because of the Federal Switchblade Act; and as direct result, believes that his Second Amendment right to keep and bear arms has been unconstitutionally infringed upon. If it were not for the Federal Switchblade Act's prohibitions and penalties, Plaintiff Shedd would continue to legally possess his automatically opening knife at his residence in Tulsa, Oklahoma within the "Indian Country" of the Muscogee Nation. More specifically, he was forced to get rid of his lawfully owned property for fear of being in violation of the Federal Switchblade Act and subject to criminal

prosecution and severe criminal penalties.

89.    Plaintiff Shedd's Second Amendment rights provide him with a legally protected interest to: (a) use interstate commerce to purchase an automatically opening knife in his resident state of Oklahoma, and (b) to possess and carry such knife as he travels through federal public land and Native American (Indian) reservation land in his home state of Oklahoma and in surrounding states. But for the switchblade ban under the Federal Switchblade Act (Sections 1242, 1243) and the related criminal fines and possible imprisonment, or both, Mr. Shedd would have retained possession of his automatically opening knife and would purchase, possess, use, and carry other such automatically opening knives while living with the Muscogee Nation territory for lawful uses such as personal use, and protection throughout his home state of Oklahoma, in surrounding states, and within and through Native American (Indian) land and federal land.

90.    Plaintiff Shedd would also purchase and acquire various models of automatically opening knives through online sales and other forms of interstate commerce. However, Plaintiff Shedd is precluded from doing so by the stated provisions of the federal switchblade Act and its related criminal fines and possible imprisonment, or both.

91.    If the switchblade ban under the Federal Switchblade Act were lifted or permanently enjoined, Plaintiff Shedd will purchase, possess, use, and carry an automatic opening knife for various lawful uses, including self-defense. He will do so now and, in the future, but for the Federal Switchblade Act, and the risk of prosecution and the imposition of severe criminal penalties.

92.    The injury/harm that Plaintiff Shedd has sustained (*i.e.*, preclusion of his ability to purchase, possess, and carry an automatic opening knife for any lawful purpose within "Indian Country") is directly traced to the switchblade ban under the

Federal Switchblade Act and Defendant officials who are responsible for its enforcement. His injury/harm to his Second Amendment rights can and should be redressed by the Court's grant of a permanent injunction against enforcement of Sections 1242 and 1243 of the Federal Switchblade Act.

**ADDITIONAL RETAIL PLAINTIFFS' STANDING ALLEGATIONS**

93.    As alleged, Plaintiff Arnold is the owner and operator of Plaintiff RGA Auction Services LLC, dba Firearm Solutions; and Plaintiff Folloder is the owner and operator of Plaintiff MOD Specialties. Both Plaintiff Firearm Solutions and Plaintiff MOD Specialties hold, and have maintained, FFLs. If these Plaintiffs engage in conduct that violates the Federal Switchblade Act, such violations can result in ATF issuing notices of violation leading to revocation or non-renewal of their FFLs. These Plaintiffs could use the so-called "Spyderco Acknowledgment and Representations" form in the hope of avoiding prosecution, but they allege that the acknowledgment and representation requirements are themselves needless, impermissible, and a violation of their Second Amendment rights. As such, Plaintiffs intend to acquire and distribute automatically opening knives without adhering to the stated exceptions included in the FSA.

94.    If the prohibitions under the Federal Switchblade Act were to be ruled unconstitutional and enjoined, Plaintiffs Arnold and Folloder would immediately contact various manufacturers of automatic opening knives throughout the country to place orders, and to receive and acquire such knives *via* interstate commerce and subsequently sell such knives inside and outside of Texas. Specifically, Plaintiffs Arnold and Folloder would contact manufacturers, such as Benchmade, Hogue, and Spyderco. They would immediately sign up as official dealers for these companies.

95.    Plaintiff Folloder contacted the Area Supervisor of the ATF in the Houston Field Division, and the Supervisor told him that his ability to renew a

federal firearms license is dependent on whether he is under indictment, has been convicted in any court of a felony, or any other crime for which a court could imprison him for more than one year. The Federal Switchblade Act and its criminal penalties meet these criteria. This same threat of license revocation or non-renewal applies with equal force to Plaintiff Arnold and his ability to renew Firearm Solutions' FFL. As such, neither the prosecution or conviction of violating the FSA is required to jeopardize Plaintiffs' livelihood and business. Plaintiffs are not willing to jeopardize their federal firearms licensing, or renewal, by engaging in the allegedly prohibited conduct under Sections 1242 and 1243 of the Federal Switchblade Act. The jeopardy is the real and concrete risk of the loss or non-renewal of their FFLs.

**DEFENDANTS**

96.     Defendant Merrick B. Garland is the United States Attorney General. As Attorney General, Defendant Garland is the head of the U.S. Department of Justice (DOJ). Defendant Garland is sued in his official capacity. Plaintiffs are informed and believe, and on that ground allege, that Defendant is responsible for the enforcement of the Federal Knife Ban.

97.     Defendant United States Department of Justice is a federal agency located at 950 Pennsylvania Avenue, NW, Washington, D.C. 20530.

## JURISDICTION AND VENUE

98.     Venue lies in this Court under 28 U.S.C. § 1391, as this is an action against officers and agencies of the United States, a plaintiff resides in this judicial district, no real property is involved in this action, and the events giving rise to Plaintiffs' claims arose or exist in this District in which the action is brought.

99.     Title 28 U.S.C. § 1331 supplies the Court with original federal question jurisdiction over this action because the action arises under the U.S. Constitution and

laws of the United States.

## STATEMENT OF FACTS

100.   Federal law defines a "switchblade knife" to mean any knife having a blade which opens automatically— (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both. See 15 U.S.C. 1241(b).  The term "interstate commerce" means "commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof." 15 U.S.C. § 1241(a).

101.   Under the challenged statutes, "[w]hoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." 15 U.S.C. § 1242.[1]

102.   Further, "[w]hoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." 15 U.S.C. § 1243.

103.   The Federal Knife Ban has limited exceptions. The ban does not apply to:

> (1) any *common carrier or contract carrier*, with respect to any switchblade knife shipped, transported, or delivered for shipment

---

[1]  To be clear, Plaintiffs do not challenge the Federal Knife Ban restrictions regarding importation of "switchblade" knives into the United States at this time. See 15 U.S.C. 1241; Code of Federal Regulations Title 19, Ch. 1, Part 12, sections 12.95-12.103.

in interstate commerce in the ordinary course of business;

(2) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to *contract with the Armed Forces*;

(3) the *Armed Forces or any member or employee thereof* acting in the performance of his duty;

(4) the possession, and transportation upon his person, of any switchblade knife with a blade three inches or less in length *by any individual who has only one arm*; or

(5) a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.

See 15 U.S.C. § 1244(1)-(5).

104.   Thus, the Federal Knife Ban unconstitutionally infringes on the fundamental right to buy, sell, trade, possess, or carry any switchblade knife, as defined, between any of the 50 states, Washington D.C., and any of the U.S. territories despite that automatically opening knives are common arms protected by the Second Amendment.

105.   While Defendants have made the claim that there have been limited prosecutions under sections 1242, 1243, and 1244 of the Federal Switchblade Act, there is no question that these sections are in effect and enforced.

106.   For example, in 2020, federal and state agencies raided Johan Lumsden, who owned and operated Roadside Imports, LLC in Colorado—a switchblade manufacturer and dealer. Mr. Lumsden is a current member of Plaintiff Knife Rights.

107.   Based on the "search and seizure warrants" and related documents,, enforcement officers initiated a violent raid of his home/business using flashbang or like devices. Mr. Lumsden was arrested, detained, and questioned for hours sustaining injuries to his hands and wrists; his dog was injured and "tased" by law

enforcement; authorities seized/confiscated approximately 2.8 million dollars worth of switchblades and switchblade parts from Mr. Lumsden home/business; shut down his multiple retail websites; and forced him out of business.

108.   While he was never charged, Mr. Lumsden was detained, questioned, physically injured, and had valuable property seized as a result of authorities enforcing in Sections 1242, 1243, and 1244 of the Federal Switchblade Act. Mr. Lumsden's property was eventually returned in 2023, significantly damaged.  Mr. Lumsden also sustained substantial injury, loss, and harm, including the damage/loss of his inventory with an estimated value in the millions of dollars. Further, Mr. Lumsden's computers and hard drives used for his business were confiscated and have not been returned. Mr. Lumsden still lives under a cloud of possible enforcement/prosecution.

109.   As recently as March 7, 2024, the U.S. Customs and Border Patrol published an article on its website stating, "Switchblade knives and other spring-loaded knives are prohibited and may be subject to seizure (there is an exception for one-armed persons). According to the Federal Switchblade Act, folding knives with a blade bias toward closure are not considered switchblades."[2]

110.   Further, Defendants boldly proclaim that the federal government shows four enforcement actions under the Federal Switchblade Act; and that the Act has not been enforced since 2010. Nowhere, however, do Defendants disavow enforcement. Specifically, nowhere do Defendants disclose that they no longer enforce the Federal Switchblade Act or that they will not enforce the law in the future. Further, Defendants' statement about low prosecutions since 2010 is not evidence that there have been no arrests, raids, charges, or pleas under the challenged

---

[2]  https://www.helpspanish.cbp.gov/s/article/Article-1123?language=en_US

provisions of the Federal Switchblade Act. To the contrary, any "lack of recent prosecutions" is evidence of the fact that the U.S. knife industry is largely abiding by the restrictions under the FSA. It further shows that Defendants' have succeeded in enforcing the FSA through their prior raid of Mr. Lumsden and the prosecution of Spyderco, along with the active and ongoing enforcement of the terms and conditions of Spyderco's prosecution—which have been adopted by the automatic knife industry in the United States.

111.   As Plaintiffs have sufficiently alleged, they have no intention of abiding by the FSA's provisions, nor any stated exceptions to the interstate commerce restrictions under the FSA. The Federal Switchblade Act remains "on the books" and can be enforced now and in the future. And Plaintiffs' stated intent places them in the crosshairs of Defendants incurring significant and real threat of prosecution.

112.   Defendants could publish an official stance from the Attorney General or the Department of Justice that the challenged sections of the Federal Switchblade Act will not be enforced now and in the future. But Defendants have provided no such evidence or written assurances. Defendants could also affirm that the Federal Switchblade Act will not be used to halt: (a) the interstate commerce of switchblade knives, or (b) their possession and carry within and through Native American (Indian) land and federal public land. But Defendants have provided no such affirmation. Plaintiffs allege on information and belief that even if Defendants provided present-day assurances, no assurances exist that future administrations would not rescind the assurances and engage in a "zero tolerance" enforcement policy.

113.   All above facts show that Defendants enforce Sections 1242, 1243, and 1244 of the Federal Switchblade Act; and that they have not disavowed enforcement now or in the future. If Plaintiffs were to move forward and knowingly violate

Sections 1242, 1243, and 1244, they will be under a very real threat of being detained, arrested, and subject to search and seizure for an unknown time period.

114.   Based on information and belief, the prohibitions under Section 1243 of the Federal Switchblade Act are also enforced on, within, and through federal lands such as BLM public land and National Parks via 36 CFR § 2.4(g), which explicitly states "the carrying or possessing of a weapon, trap or net in violation of applicable Federal and State laws is prohibited."

115.   Further, on information and belief, the enforcement of the relevant sections of the Federal Switchblade Act have been, and continue to be, enforced via past prosecutions and plea deals that are still in effect to this day. For example, as alleged above, in April 2007, the knife manufacturer and dealer Spyderco had knife products—including butterfly knife parts, which fall under the definition of switchblades pursuant to the Federal Switchblade Act and relevant regulations—seized/confiscated and the company subsequently pled to a different charge. As part of the plea agreement, on information and belief, Spyderco was forced to adhere to the prohibitions of the Federal Switchblade Act. In addition, on information and belief, Spyderco is still actively forced to require all dealers in switchblade knives to sign and agree to a required notice/policy. Additionally, Spyderco was forced to forfeit approximately one-half million dollars worth of product and pay substantial fines as a part of the plea deal/judgment.

116.   The Spyderco conviction involved a major knife manufacturer; the conviction was well known in the knife industry; and it served as a real, concrete, and imminent deterrent for knife manufacturers and dealers throughout the United States concerning violations of the Federal Switchblade Act and Defendants' enforcement of the Act.

117.   While the Spyderco conviction may have been in 2007, the mandatory

adherence of the Federal Switchblade Act through the plea deal and judgment, which is still in effect, is another example of the present and real enforcement of the Federal Switchblade Act.

118.   Moreover, the knife industry has implemented the very same notice/policy regarding switchblade sales that was enforced against Spyderco and actively enforced today. In other words, the prior raid on Mr. Lumsden and the prosecution of Spyderco has acted, and continues to act, as an active and ongoing enforcement threat to the automatic knife industry throughout the United States.

119.   Automatically opening knives are "arms" under the plain text of the Second Amendment. Moreover, Plaintiffs' desire to keep and bear these arms for self-defense and other lawful purposes now and in the future. This conduct is covered by the plain text of the Second Amendment. As such, the Second Amendment presumptively protects the arms proscribed under the Federal Knife Ban and the Plaintiffs' intended conduct. *See Bruen*, 142 S. Ct. at 2126.

120.   To justify an arm regulation, "the government must demonstrate that the regulation is consistent with the Nation's historical tradition of [arms] regulation." *Bruen*, 142 S.Ct. at 2126, 2130.

121.   Automatically opening knives were first produced in the 1700s. *See* RICHARD V. LANGSTON, THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30 (2001); *see also*, TIM ZINSER ET. AL., SWITCHBLADES OF ITALY 7-8 (2003).

122.   By the mid-nineteenth century, factory production of automatically opening knives made them affordable to everyday customers. *See* RICHARD V. LANGSTON, THE COLLECTOR'S GUIDE TO SWITCHBLADE KNIVES 30, at 7 (2001).

123.   Indeed, on Plaintiffs' information and belief, millions of automatically opening knives have been in common use for decades and longer.

124.   Automatically opening knives are also common jurisdictionally. As of January 2023, at least 46 states allow the possession of automatically opening knives; and at least 36 states permit the public carry of said knives in some manner.

125.   The automatically opening knives prohibited under the Defendants' enforcement of the Federal Knife Ban are like other constitutionally protected knives that do not have the blade fixed in place in all relevant respects. They have a blade, a handle or grip, and the blade rests within the handle or grip of the knife when closed or collapsed, and when open or extended is "fixed" into a usable position (likewise through friction, geometry, or mechanical design) and may be used in the same manner as any other common knife.

126.   Automatically opening knives "are particularly easy to open with one hand." *See*, *e.g.*, David Kopel, Clayton Cramer, and Joseph Edward Olson, *Knives and the Second Amendment*, University of Michigan Journal of Law Reform, vol. 47, at 175 (Fall 2013). However, since a folding knife *of any kind* is only functional when fully opened, the argument that one method of opening a knife with one hand somehow increases the dangerousness to the public of a folding knife compared to the myriad of other methods of opening a knife with one hand is ludicrous. Whether a folding knife is opened manually or automatically, it is only useful, for any purpose, once it is fully opened.  Thus, "Prohibitions on carrying knives in general, or of particular knives, are unconstitutional. For example, bans of knives that open in a convenient way (*e.g.*, switchblades, gravity knives, and butterfly knives) are unconstitutional." *Id*. at 167.

127.   In simple terms, an automatically opening knife is merely a folding pocket knife, an arm that is possession in millions of households in this country. According to estimates from American Knife & Tool Institute, as many as 35,695,000 U.S. households own an outdoor knife or pocket knife. Moreover,

assisted-opening and one-hand-opening knives—which are functionally identical to automatically opening knives—are approximately 80 percent of all folding knives sold in the United States.

128.    Defendants' enforcement of the Federal Knife Ban denies individuals who reside in the United States, including the named Individual Plaintiffs and the Institutional Plaintiff's members, their fundamental, individual right to keep and bear these common, constitutionally protected arms for lawful purposes, including self-defense.

129.    The Federal Knife Ban has no historical pedigree, nor justification in the Nation's history and tradition of arms regulation. Indeed, the Federal Knife Ban dates only to 1958.

130.    Automatically opening knives, including those prohibited under the Federal Knife Ban, are in common use for lawful purposes throughout the vast majority of the United States. Because automatically opening knives, including those prohibited under the Federal Knife Ban, are possessed by peaceable people, they are not (and could not be) *both* "dangerous *and* unusual" arms.

131.    There is no constitutionally relevant difference between knives the that may be acquired, possessed, carried, sold, and distributed through interstate commerce throughout the United States and those prohibited under the Federal Knife Ban.

## CLAIM FOR RELIEF

### COUNT I
### DEPRIVATION OF CIVIL RIGHTS RIGHT TO KEEP AND BEAR ARMS
### U.S. CONST., AMEND. II (28 U.S.C. § 1331; 42 U.S.C. § 1983)

132.    Plaintiffs incorporate herein by reference the foregoing paragraphs as if

fully set forth herein.

133.   There is an actual and present controversy between the parties.

134.   The Second Amendment to the United States Constitution provides:

> A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.

135.   In *Heller*, 554 U.S. 570 (2008), the Supreme Court declared unconstitutional the District of Columbia's laws that, among other things, prevented Mr. Heller from having a handgun "operable for the purpose of immediate self-defense." 554 U.S. 570 at 635. The word "immediate" means, as is relevant here, "occurring, acting, or accomplished without loss or interval of time," *i.e.* "instant," "existing without intervening space or substance," and "acting or being without the intervention of another object, cause, or agency." *See*, *e.g.*, https://www.merriam-webster.com/dictionary/immediate.

136.   The Supreme Court "already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances. The Second Amendment's reference to arms does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).

137.   "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. "Thus, even though the Second Amendment's definition of arms is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. *Cf. Caetano v. Massachusetts*, 577 U. S. 411, 411-412,

136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (per curiam) (stun guns)." *Id*.

138.    In *Caetano*, Justice Alito issued a concurring opinion, joined by Justice Thomas, explaining that, in determining whether an arm is protected under the Second Amendment, "the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411 at 420. Indeed, the Massachusetts Supreme Judicial Court "offered only a cursory discussion of that question, noting that the 'number of Tasers and stun guns is dwarfed by the number of firearms.'" *Id.*, quoting 470 Mass., at 781, 26 N.E.3d, at 693. "This observation may be true, but it is beside the point. Otherwise, a State would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home." 577 U.S. 411 at 420 (quoting *Heller*, 554 U.S. at 629) (cleaned up).

139.    As Justice Alito further explained, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id.* (quoting *People v. Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional) (cleaned up).

140.    In *Bruen*, the Court reaffirmed principles it clearly applied in *Heller*. *Bruen* reiterated that "the Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Id*. at 2132 (emphasis added).

141.    There can be no dispute over the proper approach to evaluating Second Amendment claims. First, the Court must determine whether "the Second Amendment's plain text covers an individual's conduct" that is being restricted by a challenged law or policy. *Bruen*, 142 S. Ct. at 2129 – 30. Second, if the answer is yes, the conduct is presumptively protected, and the burden then falls to the

government to justify the challenged restriction by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. If the government cannot make this demonstration, the restriction is unconstitutional, full stop. No interest-balancing or levels-of-scrutiny analysis can or should be conducted. *Id*. at 2127.

142.   Automatically opening knives — including those proscribed under the Federal Knife Ban — are widely possessed and used for lawful purposes across much of the Country.

143.   *Bruen* confirms that the Second Amendment's plain text covers the arms (knives) and conduct Plaintiffs wish to engage in (keep and bear arms). *Bruen* *also* confirmed that *Heller* already conducted the relevant historical analysis for determining whether a particular arm falls within the Second Amendment's protection. In order for a ban of an arm to be consistent with this Nation's history of firearm regulation, the government must demonstrate that the banned arm is both "dangerous and unusual." *Id*. at 2143. Arms that are in "common use today" simply cannot be banned. *Id*.

144.   When an arm is possessed and used by thousands for lawful purposes, it is "in common use" and it is protected — full stop. If an arm is in common use, it necessarily cannot be *both* "dangerous and unusual." And moreover, even arms not "in common use" cannot be banned so long as they are no more dangerous than other arms that are in common use.

145.   Even if the numerical quantity of any arm is difficult to establish, an arm being in common use can be proved by categorical and jurisdictional commonality. If an arm is categorically analogous or similar enough to a protected arm and that it is lawful for them to be sold to private citizens in the majority of states, then the arm is common. As such, it cannot be both "dangerous and unusual"

if it is lawful to possess and use in a majority of the Country.

146.   Common use operates in one direction: An arm that is initially uncommon can become common over time, but an arm that is common cannot become uncommon.

147.   Defendants' enforcement of the Federal Knife Ban prohibits constitutionally protected arms and conduct, and thus violates the Second Amendment to the United States Constitution.

148.   "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U. S., at 780 [plurality opinion]).

149.   "The very enumeration of the [Second Amendment] right takes out of the hands of government"— including Defendants — "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 635 (emphasis in original).

150.   Defendants have been enforcing, and are enforcing the Federal Knife Ban. Plaintiffs reasonably fear that the Defendants will continue to enforce the Federal Knife Ban against them now and in the future.

151.   By enforcing the Federal Switchblade Act, threatening to enforce it, and not disavowing enforcement, now and in the future, Defendants have violated the Plaintiffs' rights protected under the Second Amendment.

152.   Defendants' enforcement of the Federal Switchblade Act, at issue in this case cause injury and damage actionable under federal law, 28 U.S.C. §1331, 42 U.S.C. § 1983. Plaintiffs thus seek declaratory and injunctive relief and recovery of attorneys' fees and costs.

1
2
## **PRAYER FOR RELIEF**

3    WHEREFORE, Plaintiffs pray for the following relief:

4    1.    A declaratory judgment that the relevant provisions of Federal Knife
5
Ban and Defendants' enforcement of the Federal Knife Ban violates the right to keep
6
and bear arms protected under the Second Amendment to the U.S. Constitution;
7
8    2.    Preliminary and permanent injunctive relief restraining the Defendants
9
and their officers, agents, servants, employees, and all persons in concert or
10
participation with them who receive notice of the injunction, from enforcing the
11
Federal Knife Ban;
12
13    3.    All other and further legal and equitable relief, including injunctive
relief, against Defendants as necessary to effectuate the Court's judgment, and/or as
14
the Court otherwise deems just and equitable; and,
15
16    4.    Attorney's fees and costs pursuant to 42 U.S.C. §§ 1988, 2000b-1, and
17
any other applicable law.
18    Respectfully submitted this 27th day of September, 2024.

19
20
21    /s/ John W. Dillon
22    John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
23    DILLON LAW GROUP APC
2647 Gateway Road, Suite 105, No. 255
24    Carlsbad, California 92009
25    Phone: (760) 642-7150

26
27    *Pro Hac Vice Application Forthcoming*
28

R. Brent Cooper (SBN 04783250)
brent.cooper@cooperscully.com
Cooper & Scully PC
900 Jackson, Suite 100, Dallas, TX 75202
Phone: (214) 712-9500

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**